**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **REED K. BILZ, KATHERINE E. GODBY, ELIZABETH "LIZ" D. MILLER, and KARLA L. PALOMARES,** | § | **CIVIL ACTION NO. 4:26-cv-01149-O** |
| ***Plaintiffs*,** | § | |
| **vs.** | § | |
| **TIM O'HARE, *County Judge, in his official capacity, and* TARRANT COUNTY, TEXAS,** | § | |
| ***Defendants.*** | § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. The Decorum Policy regulates protected speech and expressive conduct and gives Defendant O'Hare unfettered enforcement authority. ..... 2

II. Defendants have used the Decorum Policy to punish residents who speak or engage in expressive conduct at Commissioners Court meetings. ..... 5

III. Plaintiffs alter their speech and conduct because they fear punishment under the Decorum Policy. ..... 7

ARGUMENT ..... 9

I. Plaintiffs are substantially likely to succeed on the merits. ..... 9

a. The Decorum Policy is unconstitutionally overbroad. ..... 10

i. *Merriott v. City of Bossier City* is on point. ..... 11

ii. The Decorum Policy is even broader than the policy in *Merriott*. ..... 13

iii. The Decorum Policy's overbreadth has already harmed plaintiffs and other constituents. ..... 16

b. The Decorum Policy is unconstitutionally vague. ..... 17

i. The Challenged Provisions do not adequately articulate what conduct is prohibited. ..... 18

ii. The Challenged Provisions allow for arbitrary and discriminatory enforcement. 20

II. Plaintiffs satisfy the remaining requirements for a preliminary injunction. ..... 23

III. Request for waiver of bond requirement. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**CASES** **PAGES**

*Acosta v. City of Costa Mesa*
718 F.3d 800 (9th Cir. 2013) .......... 14

*Book People, Inc. v. Wong*
91 F.4th 318 (5th Cir. 2024) .......... 24

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*
636 F.2d 1084 (5th Cir. Unit B 1981) .......... 24

*Coates v. City of Cincinnati*
402 U.S. 611 (1971) .......... 12, 18, 19, 23

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*
710 F.3d 579 (5th Cir. 2013) .......... 10

*Elrod v. Burns*
427 U.S. 347 (1976) .......... 23

*F.C.C. v. Fox Television Stations, Inc.*
567 U.S. 239 (2012) .......... 19

*Freedom from Relig. Found. v. Abbott*
955 F.3d 417 (5th Cir. 2020) .......... 21

*Holder v. Humanitarian Law Project*
561 U.S. 1 (2010) .......... 20

*Kaepa, Inc. v. Achilles Corp.*
76 F.3d 624 (5th Cir. 1996) .......... 24

*Kramer v. Price*
712 F.2d 174 (5th Cir. 1983) .......... 19, 20, 21, 23

*Lowery v. Mills*
157 F.4th 729 (5th Cir. 2025) .......................................................................................... 10

*Merriott v. City of Bossier City*
179 F.4th 393 (5th Cir. 2026) ...................................................................................... passim

*Miller v. California*
413 U.S. 15 (1973)............................................................................................................ 15

*New York Times Co. v. Sullivan*
376 U.S. 254 (1964).......................................................................................................... 20

*Opulent Life Church v. City of Holly Springs*
697 F.3d 279 (5th Cir. 2012) ........................................................................................ 9, 23

*Reeves v. McConn*
631 F.2d 377 (5th Cir. 1980) .............................................................................................. 21

*Roy v. City of Monroe*
950 F.3d 245 (2020)........................................................................................................... 19

*Sessions v. Dimaya*
810 F.3d 354 (5th Cir. 2016) .............................................................................................. 11

*Serafine v. Branaman*
584 U.S. 148 (2018)............................................................................................................ 18

*Texans for Free Enter. v. Tex. Ethics Comm'n*
732 F.3d 535 (5th Cir. 2013) .............................................................................................. 24

**OTHER AUTHORITIES**

Cody Copeland, *Public Speakers Hurl Expletives In Challenge Of Tarrant County's New Decorum Policy*, FORT WORTH STAR-TELEGRAM (Jan. 28. 2025), https://www.star-telegram.com/news/politics-government/article299313254.html............................................ 3

Miranda Suarez, *More Arrests Made at Tarrant County Commisioners Court During Discussions About Courtroom Behavio*r, *Meetings Civil*, KERA News (Apr. 29, 2025), https://www.keranews.org/criminal-justice/2025-04-29/tarrant-county-commissioners-court-charles-hermes-carolyn-rodriguez.FOX4 KDFW (Jul. 17, 2024), https://www.fox4news.com/news/tarrant-county-commission-meetings-speaking .................. 4

Miranda Suarez, Miranda Suarez, *Pastor Banned From Tarrant County Commissioners Court Is Now Allowed Back In The Building*, KERA NEWS (Aug. 20, 2024), https://www.keranews.org/government/2024-08-20/pastor-banned-from-tarrant-county-commissioners-court-is-now-allowed-back-in-the-building. .......... 2, 3

Miranda Suarez, *Two People Face Criminal Charges After Clapping, Swearing During Tarrant Commissioners Court Meeting*, KERA NEWS (Apr. 29, 2025), https://www.keranews.org/criminal-justice/2025-04-29/tarrant-county-commissioners-court-charles-hermes-carolyn-rodriguez .......... 3

Video of Commissioners Court Meeting, Tarrant Cnty. (Aug. 4, 2026) .......... 6, 7, 22

Video of Commissioners Court Meeting, Tarrant Cnty. (June 3, 2025) .......... 5, 6, 22, 23

**DICTIONARY REFERENCES**

*Attack*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/attack .......... 14

*Disrupt*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/disrupt. .......... 15

*Disruptive*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/disruptive. .......... 15

*Obscene*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/obscene. .......... 14

*Profane*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/profane .......... 14

*Threatening*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/threatening. .......... 15

*Unruly*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/unruly. .......... 15

**RULES**

Fed. R. Civ. P. 65 .......... 24, 25

**INTRODUCTION**

The right of citizens to speak freely to the government officials who represent them is a bedrock principle of American democratic life enshrined in the First Amendment. That is especially so when citizens are gathered in public forums where government power is exercised. In Tarrant County, Texas ("Tarrant County" or "County"), that includes Commissioners Court meetings, where Defendants make decisions directly affecting the health, safety, and welfare of the County's nearly 2.2 million residents. Those decisions include setting the County's tax rate, approving its budget, and authorizing contracts; overseeing roads and infrastructure; drawing precinct lines for voting and authorizing polling locations; and supporting operations for the local judicial system, jails, public health programs, and emergency management.

Yet the Tarrant County Commissioners Court has made it costly for members of the public to speak candidly and critically with the Court. On January 28, 2025, Defendants adopted the Tarrant County Commissioner's Court Rules of Decorum ("Decorum Policy" or "Policy"). The Policy unconstitutionally limits residents' ability to speak on matters of public concern by prohibiting a broad swath of speech and expressive conduct without defining any of these terms or providing any objective criteria by which a speaker could know what is permitted. *See* App. 002–04. Violations of these provisions can result in civil and criminal sanctions. *Id.* at 004.

The First Amendment forbids these vague and overbroad limitations on the public's right to speak. Moreover, applying Defendant O'Hare's unfettered discretion to interrupt or excuse a speaker and the Decorum Policy's harsh sanctions ranging from removal to criminal prosecution, Defendants have selectively reprimanded speakers, ordered them removed, had them forcibly dragged them out, arrested them, banned them from future meetings, jailed them, and criminally charged them for their protected political speech. Residents have also been silenced for non-

disruptive expressive conduct such as clapping, laughing, and silently standing in support of other speakers. Yet Plaintiffs have never seen Defendant O'Hare punish speakers or attendees for engaging in similar expressive acts in support of him and policies he favors.

Plaintiffs are substantially likely to succeed on the merits of their claims that the Decorum Policy violates the First and Fourteenth Amendments. Like another decorum policy using substantially similar terms which the Fifth Circuit recently found unconstitutional, *see Merriott v. City of Bossier City*, 179 F.4th 393 (5th Cir. 2026), the Decorum Policy here is overbroad because its near-limitless number of unconstitutional applications substantially outweigh its constitutional applications. And the Decorum Policy is unconstitutionally vague because it fails to give speakers fair notice of what conduct is prohibited while inviting arbitrary and discriminatory enforcement. The remaining preliminary injunction factors also favor Plaintiffs. The loss of First Amendment freedoms constitutes irreparable injury; the balance of equities and public interest overwhelmingly favor protecting Plaintiffs' constitutional rights; and Defendants suffer no cognizable harm from being enjoined from violating the Constitution. The Court should grant Plaintiffs' Motion for a Preliminary Injunction.

## FACTUAL BACKGROUND

### I. The Decorum Policy regulates protected speech and expressive conduct and gives Defendant O'Hare unfettered enforcement authority.

Defendant O'Hare has a history of silencing dissent in the Commissioners Court. Prior to the enactment of the current Decorum Policy, O'Hare regularly removed speakers from Commissioners Court meetings and, in some instances, barred them from returning.[1] On January

[1] On July 2, 2024, for example, Reverend Ryon Price spoke eight seconds beyond his allotted public-comment time. App. 009 ¶ 16. Within those eight seconds, Defendant O'Hare issued two warnings and ordered deputies to remove him. *Id.* Price was then issued a criminal-trespass warning barring him from returning for one year, although the warning was later lifted after he appealed. Miranda Suarez, *Pastor Banned From Tarrant County Commissioners Court Is Now Allowed Back In The Building*, KERA NEWS.

28, 2025, the Commissioners Court considered the current Decorum Policy.[2] During discussion of the Policy, members of the public and Commissioners raised First Amendment problems with the Policy's text. Commissioner Alisa Simmons expressed concern that the Policy placed too much discretion in the hands of Defendant O'Hare. County attorney Mark Kratovil acknowledged that the First Amendment protects profanity but stated that profanity nonetheless violated the Policy. When Simmons asked whether the Policy "superseded the First Amendment," Kratovil responded that he would look into it.[3]

During the same meeting, Defendant O'Hare also enforced meeting rules against several attendees. Defendant O'Hare warned Professor Charlie Hermes not to clap during public comment and ordered him removed after he clapped in support of a speaker. App. 009, ¶ 18. Hermes was later charged with hindering proceedings by disorderly conduct.[4] Carolina Rodriguez was similarly removed after reciting profanities during her public comment to protest the Policy's prohibition on profane language and was later charged with the same offense.[5] Defendant O'Hare also ordered local attorney C.J. Grisham removed after he used profanity during his public comment. App. 009

---

(Aug. 20, 2024), https://www.keranews.org/government/2024-08-20/pastor-banned-from-tarrant-county-commissioners-court-is-now-allowed-back-in-the-building.

[2] Cody Copeland, *Public Speakers Hurl Expletives In Challenge Of Tarrant County's New Decorum Policy*, FORT WORTH STAR-TELEGRAM (Jan. 28. 2025), https://www.star-telegram.com/news/politics-government/article299313254.html.

[3] *Id.*

[4] Miranda Suarez, *Two People Face Criminal Charges After Clapping, Swearing During Tarrant Commissioners Court Meeting*, KERA News (Apr. 29, 2025), https://www.keranews.org/criminal-justice/2025-04-29/tarrant-county-commissioners-court-charles-hermes-carolyn-rodriguez.

[5] *Id.*

¶ 18. The Commissioners Court nevertheless adopted the Decorum Policy by a 3–2 vote, with Defendant O'Hare voting in favor.[6] It went into effect on February 1, 2025.[7]

The Decorum Policy governs public participation and conduct at Commissioners Court meetings. App. 001. Its stated purposes include "maximiz[ing] citizen participation, efficiently receiv[ing] public input, and maintain[ing] respectful decorum during each meeting." *Id.* Anyone who signs up to speak must agree to read and abide by the Policy. *Id.* at 003. The Policy directly regulates the speech and expressive conduct of attendees. In relevant part, the Policy prohibits: (1) "[p]ersonal attacks, impertinent, profane, obscene, or slanderous remarks"; (2) "[t]hreatening, disruptive, or unruly behavior"; and (3) "[d]isruptive remarks or actions of approval or disapproval from the audience, such as feet stomping, snapping, whistling, yelling, clapping, verbal affirmation or rejection, or similar distractions." *Id.*

The Decorum Policy also gives Defendant O'Hare unbounded discretion over administering each meeting's public comment period. Per the Policy's terms, the County Judge may "interrupt and/or excuse a speaker" when the speaker's time expires, when the speaker violates the guidelines, "or for any other matter at the discretion of the County Judge." *Id.*

Violations of the Policy may result in significant penalties, including removal from the Courtroom, temporary prohibition from commenting in person, cancellation of a speaker's remaining time, contempt, or referral for other civil sanctions or criminal charges. *Id.* at 004. The Policy provides no guidelines for determining which sanction applies to a particular violation. *Id.*

---

[6] Miranda Suarez, *More Arrests Made at Tarrant County Commissioners Court During Discussions About Courtroom Behavior*, KERA NEWS (Jan. 28, 2025), https://www.keranews.org/government/2025-01-28/more-arrests-made-at-tarrant-county-commissioners-court-during-discussions-about-courtroom-behavior.
[7] *Id.*

The Policy separately authorizes bailiffs to remove individuals at Defendant O'Hare's request and, under certain circumstances, issue criminal trespass warnings barring individuals from Commissioners Court meetings. *Id.* A warning may remain in effect for up to 180 days. *Id.* An individual may appeal a criminal trespass warning to the Tarrant County Civil Service Commission, which may rescind the warning, reduce its duration, or leave it in place. *Id.* The Policy provides no further details about the appeal process. *Id.*

## II. Defendants have used the Decorum Policy to punish residents who speak or engage in expressive conduct at Commissioners Court meetings.

Since the Decorum Policy took effect, Defendant O'Hare has wielded the Challenged Provisions[8] to punish a variety of speech and expressive conduct during Commissioners Court meetings. At a June 3, 2025 meeting, several attendees were removed after describing County officials or their actions as "racist."[9] One woman opposing a proposed redistricting plan described officials as "dishonest, cheaters, and racist men," after which Defendant O'Hare ordered her removed.[10] During another removal that day, Defendant O'Hare stated, "We won't be called racists."[11] He also ordered the removal of a woman who clapped during public comment in support of a speaker opposing redistricting.[12] At that same meeting, Defendant O'Hare also threatened to eject the public from the Court after Commissioner Simmons asked the audience to say "yes" aloud

---

[8] For the Court's convenience, Plaintiffs have attached a chart showing which provisions of the Policy are challenged as overbroad, and which provisions of the Policy are challenged as vague. *See* App. 039 (together the "Challenged Provisions").

[9] Video of Commissioners Court Meeting, Tarrant Cnty. (June 3, 2025) at 4:09:45, https://www.youtube.com/watch?v=FeE5l4zq5Bw [hereinafter June Meeting]; *see also id.* at 1:29:35 (Defendant O'Hare orders speaker removed for calling Defendant O'Hare "an enemy of the people and a blatant racist"); App. 010, ¶ 22.

[10] *June Meeting* at 4:09:45.

[11] *Id.* at 3:23:10; *see also* App. 010, ¶ 22.

[12] *June Meeting* at 1:31:00.

and members of the audience did so.[13] Later, Defendant O'Hare stated that "[t]here will not be any more audience interaction in the chamber" and again threatened to remove all public attendees if such interaction continued.[14]

At an August 4, 2026 meeting, public commenter Ambika Sharma used her allotted speaking time to oppose changes to polling locations.[15] Sharma stated, "You keep telling us not to California my Texas, while in reality, you keep Russia my Texas." App. 010, ¶ 22. Some audience members giggled or lightly applauded, and in response, Defendant O'Hare *ordered the entire public out* of the meeting room.[16] For approximately the next hour and a half, only those individuals registered to speak were permitted to enter, one at a time.[17] When Defendant O'Hare reopened the room, he warned that further "disruptions" would result in the room being cleared again.[18] Another member of the public EJ Carrion stated, "You've said you're all about cooling the temperature, and yet you vote for this extremist bullshit. All of you are bullshit."[19] Defendant O'Hare ordered Carrion removed, and eight days later, Carrion was arrested for allegedly disrupting a meeting or procession.[20]

---

[13] *Id.* at 4:48:00.

[14] *Id.* at 5:19:00.

[15] Video of Commissioners Court Meeting, Tarrant Cnty. (Aug. 4, 2026) at 2:28:23, https://www.youtube.com/watch?v=kc7WA_VNrxI [hereinafter *August Meeting*]; *see also* App. 010, ¶ 21.

[16] *August Meeting* at 2:28:23.

[17] *Id.* at 2:46:40–4:11:29.

[18] *Id.* at 2:47:03.

[19] *Id.* at 2:05:06.

[20] Robert Downen, *He Cursed at a Public Meeting. Then He Was Arrested*, TEX. MONTHLY (Aug. 18, 2026) https://www.texasmonthly.com/news-politics/tarrant-county-arrest-public-meeting; *see also* App. 020, ¶ 30.

### III. Plaintiffs alter their speech and conduct because they fear punishment under the Decorum Policy.

Plaintiffs regularly attend Commissioners Court meetings and speak during public comment. App. 007, ¶ 5; App. 017, ¶ 5; App. 026, ¶ 5; App. 032, ¶ 5. Each Plaintiff is familiar with the Decorum Policy but does not always know what speech or conduct will be considered a violation. App. 009–10, ¶¶ 14–26; App. 018–21, ¶¶ 13–33; App. 026–28, ¶¶ 10–17; App. 032–33, ¶¶ 8–9. They have witnessed or learned of speakers being reprimanded, removed, barred from meetings, or arrested for allegedly violating the Decorum Policy. App. 009, ¶ 15; App. 019–21, ¶¶ 23–31; App. 027, ¶ 13; App. 033–34, ¶¶ 13–16. Plaintiffs Katherine E. Godby and Elizabeth "Liz" D. Miller were among the members of the public ordered out of the meeting room on August 4, 2026.[21]

Plaintiffs fear consequences ranging from reprimand, removal, banishment, and even arrest. App. 011, ¶¶ 28–29; App. 022, ¶¶ 36–37; App. 028–29, ¶¶ 18–21; App. 037, ¶ 29. As a result, they self-censor both the views they express during public comment and their expressive conduct while observing meetings as members of the audience. App. 011–13, ¶¶ 31–36; App. 022, ¶ 40; App. 028–29, ¶¶ 19–22; App. 036, ¶ 25. Each intends to continue attending and speaking at Commissioners Court meetings. *See* App. 007, ¶ 5; App. 017, ¶ 5; App. 026, ¶ 5; App. 032, ¶ 5.

Plaintiff Reed K. Bilz writes her public comments in advance and edits them based on what she has seen happen to other speakers, because she does not wish to suffer the same consequences. App. 011–13, ¶¶ 30–36. For example, she has refrained from using words such as "racist" and "bigot" when criticizing County officials because she fears how Defendant O'Hare will respond. *Id.* at 012, ¶¶ 33–34. Bilz also made multiple changes to a speech she prepared to give on proposed

---

[21] *See August Meeting* at 2:28:24 (Defendant O'Hare ordering meeting attendees to clear the room).

polling-place cuts on September 1, 2026, while watching how Defendant O'Hare was treating other speakers addressing similar issues. *Id.* at 012, ¶ 32. Bilz always prepares her remarks with these concerns in mind. *Id.* at 012–13, ¶ 36. Similarly, on September 1, 2026, Bilz joined several attendees who stood silently in support of remarks by Commissioner Simmons. *Id.* at 013, ¶¶ 40–42. The group did not clap, yell, speak, or otherwise make noise. *Id.* But Defendant O'Hare instructed the group to "[s]it down." *Id.* Bilz complied because she feared that refusing could result in her removal or arrest. *Id.*

Plaintiff Miller also limits her speech because she is uncertain how the Decorum Policy will be enforced. App. 028, ¶¶ 17–19. That uncertainty affects how freely she expresses herself, and she carefully considers and edits her words because she does not want to risk being removed or physically handled by Court officials or law enforcement. *Id.* Miller fears being barred from future meetings because she believes she brings a perspective often unheard in the County and important to public discussion. *Id.* at 028–29, ¶¶ 21–22. The possibility of losing access to those meetings contributes to her decision to self-censor. *Id.*

Plaintiff Godby also prepares her remarks with the Decorum Policy and its potential enforcement in mind. App. 021–22, ¶¶ 34–40. She writes and practices her remarks before speaking and sometimes refrains from using words that would naturally express her frustration with Defendants' actions because she is concerned about how Defendant O'Hare might respond. *Id.* at 022, ¶¶ 38–40. Godby also practices her public comments aloud to her husband to ensure that she remains within the applicable limit on speaking time. *Id.* She refrains from clapping, speaking out, or otherwise reacting during meetings due to these concerns. *Id.* at 023, ¶¶ 41–43. She has also observed more than one speaker attempt to use part of their allotted public-comment time for a moment of silence in remembrance of individuals who died in the County jail, only for

Defendant O'Hare to prohibit them from doing so. *Id.* at 021, ¶ 35. Godby would like to use some of her own public-comment time for a similar moment of silence but has refrained because of what she observed. *Id.*

Plaintiff Karla L. Palomares alters her prepared remarks because of the Decorum Policy. App. 037, ¶¶ 29, 30. She avoids words or phrases she believes Defendants might interpret as divisive. *Id.* She has also observed Defendant O'Hare interrupt speakers who called for increased accountability for the Tarrant County Sheriff's Office while addressing an agenda item concerning the cost of legal representation for law enforcement in wrongful-death litigation. *Id.* at 034–35, ¶ 17. Although Palomares viewed those subjects as related, Defendant O'Hare did not. *Id.* She therefore sometimes omits points from her remarks when she is uncertain whether Defendant O'Hare will consider them germane. *Id.* at 037, ¶¶ 29–30.

## ARGUMENT

Plaintiffs are entitled to relief because they have shown (1) "a substantial likelihood of success on the merits" of their overbreadth and vagueness claims, (2) "a substantial threat of irreparable [injury]" absent injunction, (3) "that the threatened injury outweighs [any] harm" the injunction may cause the opposing party, and (4) "that the injunction will not disserve the public interest." *See Opulent Life Church v. City of Holly Springs,* 697 F.3d 279, 288 (5th Cir. 2012).

### I. Plaintiffs are substantially likely to succeed on the merits.

Plaintiffs are substantially likely to succeed on the merits of their claims that the Challenged Provisions are facially overbroad in violation of the First Amendment and are facially vague in violation of the Fourteenth Amendment. To establish a "substantial likelihood of success on the merits" in the Fifth Circuit, Plaintiffs need only to "present a prima facie case" and "need

not prove that [they are] entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

Here, based on Fifth Circuit precedent involving a public meeting policy which used strikingly similar terms, the Decorum Policy is facially overbroad and vague. *See Merriott*, 179 F.4th at 399–400. By restricting "[p]ersonal attacks, impertinent, profane, obscene, or slanderous remarks" and "unruly behavior," App. 003, the Decorum Policy "prohibits speakers from uttering an infinite number of protected, relevant statements or questions." *See Merriott*, 179 F.4th at 404. And by deploying undefined terms like "personal," "impertinent," and "slanderous," App. 003, that "turn on a listener's sensitivity alone," the Policy fails "to provide speakers with a reasonable opportunity to know what conduct is prohibited," rendering those terms unconstitutionally vague. *Merriott*, 179 F.4th at 408 (citation modified).

**a. The Decorum Policy is unconstitutionally overbroad.**

To start, an overbreadth challenge is "allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the [overbroad policy] from chilling the First Amendment rights of other parties not before the Court."[22] *Lowery v. Mills*, 157 F.4th 729, 745 (5th Cir. 2025) (citation omitted). Thus, to succeed on an overbreadth challenge, Plaintiffs must show that "a substantial number of [the policy's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.*

[22] For this reason, "an overbreadth challenge is 'essen[tially] . . . an exception to the usual requirements of standing.'" *Merriott*, 179 F.4th at 402–03 (citation omitted). But "an overbreadth challenge is not appropriate if the [F]irst [A]mendment rights asserted by a party attacking a statute are essentially coterminous with the expressive rights of third parties." *Id.* at 403 (citation omitted). Here, Plaintiffs challenge a wide range of potential applications of the Decorum Policy that extend well beyond the ways in which their own speech has been impacted. Defendants have enforced the Policy against individuals for using profanity, criticizing County officials as "racist," clapping in support of other speakers, and more. *E.g.,* App. 009-10, ¶¶ 18–22. Defendants have also cleared the meeting room after audience members giggled or lightly applauded during another speaker's public comment. *Id*.

This analysis proceeds in two steps. *First*, the Court must establish the Decorum Policy's scope, as "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016). To do so, the Court should start with the text, "and proceed from the understanding that unless otherwise defined . . . terms are generally interpreted in accordance with their ordinary meaning." *Merriott*, 179 F.4th at 404 (citation modified). *Second*, the Court should use that construction to analyze whether "a substantial number of [the Policy's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Id.* at 402.

**i. Merriott v. City of Bossier City *is on point.***

*Merriott* is controlling and establishes that Plaintiffs are substantially likely to succeed on their overbreadth claim. There, the Fifth Circuit concluded that a city council decorum policy that used near-identical terms was overbroad, because it prohibited "any person [from] making ***personal, impertinent or slanderous remarks***" and "***becom[ing] boisterous*** while addressing the Council." *Id.* at 400, 402–07.

Because the policy in *Merriott* did not define these terms, the Court interpreted them according to their ordinary meanings. *Id.* Relying on Merriam-Webster Dictionary Online, it observed that "personal" usually means "of, relating to, or affecting a particular person"; that "remark" ordinarily means "an expression of opinion or judgment" or "mention of that which deserves attention or notice"; that "impertinent" ordinarily means "given to or characterized by insolent rudeness" or "not restrained within due or proper bounds especially of propriety or good taste"; and that "boisterous" ordinarily means "noisily turbulent" or "rowdy." *Id.* at 402–06.

Based on these definitions, the *Merriott* Court concluded that the policy was facially overbroad. *Id.* at 404–07. For example, the Court observed that the prohibition on "personal

remarks" encompassed "an infinite number of protected, relevant statements or questions," including the following:

> (1) using a councilmember's name for the record; (2) mentioning that a councilmember may have a personal stake in the outcome of a vote; (3) stating that a councilmember engaged in a corrupt act; (4) highlighting that a councilmember had recently been convicted of a crime; (5) claiming that a councilmember lied to the public; (6) suggesting that a councilmember had a conflict of interest; and (7) bringing to public attention that a councilmember has been sued—just to name a few.

*Id.* at 404. Because the "possible applications [we]re unquantifiable, especially [given that the policy lacked] any limiting principle," it "captured 'nothing more than bold criticism of City Council members[.]'" *Id.* at 404–06 (citation omitted).

The Court reached a similar conclusion with respect to the prohibitions on "impertinent" and "slanderous" remarks. *Id.* Absent a limiting principle, the ban on "impertinent" remarks would "effectively allow[] the City Council to decide which comments are permissible at its whim" because the definition of "impertinent" depends on what one considers to be proper or in "good taste." *Id.* at 405. The prohibition against "slanderous remarks" similarly failed to distinguish between the defamation standards that apply to public figures and private persons. *Id.* Without that distinction, the prohibition caused too great a chilling effect, leaving citizens to guess what they could and could not say about public officials. *Id.* And finally, the Court concluded "that a standalone prohibition on 'becom[ing] boisterous' is too broad to be constitutionally permissible." *Id.* at 406. Again, the Court emphasized that enforcement of this provision was highly subjective and would turn "'entirely' on 'whether or not a [councilmember] is annoyed.'" *Id.* (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

Thus, while the *Merriott* Court acknowledged that "a city may restrict speech in a limited public forum like Bossier City's City Council chamber," it emphasized that such restrictions must be "reasonabl[e] in light of the purpose of [the] forum." *Id.* Put differently, "[a]n enactment's

legitimate sweep may constitutionally encompass disturbances to regulate the manner of speech in the government's forum for the government's purpose, but it cannot do so in swaths so broad that nearly anything that could be uttered could fall within its reach." *Id.* Those concerns were heightened because the purpose of the forum at issue—City Council meetings—was to "host debate," which "is at the heart of the First Amendment tradition." *Id.* at 407.

**ii. *The Decorum Policy is even broader than the policy in* Merriott.**

The Decorum Policy is strikingly similar to the policy assessed in *Merriott*—although the Policy here sweeps further—and is thus subject to the exact same conclusion: Because it covers in a vast, disproportionate range of protected speech and expressive conduct compared to its legitimate applications, the Policy is unconstitutional even in the context of a limited public forum. *See id.* at 404–07; App. 003.

The Decorum Policy's bans on "impertinent" and "slanderous" remarks—the exact same language used in the policy at issue in *Merriott*—are problematic for the same reasons identified there. *See* App. 003; 179 F.4th at 405–06. The term "impertinent" allows Defendant O'Hare "to decide which comments are permissible at [his] whim" because enforcement of the provision turns on his subjective idea of what remarks are proper or in "good taste." *See Merriott*, 179 F.4th at 405. Similarly, the Decorum Policy's prohibition of "slanderous remarks" reaches broad swaths of protected speech because the Policy "ma[kes] no attempt to distinguish the specific forms of slander that the [County] may constitutionally prohibit," resulting in a chill that "place[s] the speaker in doubt regarding what he [can] say . . . about public officials and public figures." *See id.* (citation omitted).

Likewise, *Merriott* makes clear that the Decorum Policy's prohibition on "personal attacks" sweeps in too much protected speech and that its applications to unprotected speech, if

any, are minimal. *See id.* at 404–05. Just as the policy in *Merriott* prohibited "personal remarks," the Decorum Policy here prohibits "[p]ersonal attacks" without providing a definition for this term, or any of its terms. *See id.* As the *Merriott* Court noted, the term "personal" ordinarily means "of, relating to, or affecting a particular person." *Id.* at 404. The term "attack" is ordinarily understood to mean "to set upon or work against forcefully" or "to assail with unfriendly or bitter words."[23] Under this ordinary meaning, the ban on "personal attacks"—like the *Merriott* policy's ban on "personal remarks"—covers an "infinite number of protected, relevant statements or questions" because anything critical of Defendant O'Hare or other Commissioners could be viewed as an "attack." *See id.*

The Policy here goes even further. While *Merriott* did not address prohibitions on "profane" or "obscene" remarks, its reasoning leads to the same conclusion that those terms are unconstitutionally overbroad as well. *See id.* at 404–06. "Profane," ordinarily means "to treat (something sacred) with abuse, irreverence, or contempt" or "to debase by a wrong, unworthy, or vulgar use."[24] The ban on profane remarks therefore extends beyond mere curse words or some other limited category of speech to any speech that Defendant O'Hare views as "wrong, unworthy, or vulgar" —a broad and subjective reach that undoubtedly sweeps in protected speech. *See id.* at 404–06; *Acosta v. City of Costa Mesa,* 718 F.3d 800, 811–12 (9th Cir. 2013) (finding that prohibition on "profane" expression was overbroad (relied on in *Merriott*, 179 F.4th at 404–05)).

Likewise, *Merriott*'s reasoning regarding the overbreadth of a prohibition on "slanderous" remarks applies to the Decorum Policy's ban on "obscene" remarks. *See* 179 F.4th at 405–06. The term "obscene" ordinarily means "disgusting to the senses" or "abhorrent to morality or virtue."[25]

---

[23] *Attack*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/attack.

[24] *Profane*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/profane.

[25] *Obscene*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/obscene.

Without any narrowing language, this sweeps in all manner of ordinary protected expression, in contravention of the Supreme Court's admonition that while "obscene material is unprotected by the First Amendment," "statutes designed to regulate obscene materials must be carefully limited." *Miller v. California*, 413 U.S. 15, 23–24 (1973). Here, the Decorum Policy fails to distinguish between unprotected legal obscenity and everyday obscenity, thus sweeping in a vast amount of protected speech and expression. *See id.* (defining unprotected legal obscenity narrowly).

The Decorum Policy's prohibition on "threatening, disruptive, or unruly behavior," much like the prohibition on "becoming boisterous" in *Merriott*, is similarly "limitless" in scope. *See* App. 003; 179 F.4th at 406. The term "threatening" ordinarily means "expressing or suggesting a threat of harm, danger, etc." or "indicating or suggesting the approach of possible trouble or danger."[26] The term "disrupt" means "to break apart," "to throw into disorder," or "to interrupt the normal course or unity of."[27] The adjectival form of "disrupt"—"disruptive"—ordinarily means "disrupting or tending to disrupt some process, activity, condition, etc." or "causing or tending to cause disruption."[28] And the term "unruly" ordinarily means "not readily ruled, disciplined, or managed" or "difficult to control."[29] Putting all these definitions together, the Decorum Policy's ban on "threatening, disruptive, and unruly behavior" has no limiting principle, covering a wide array of protected expressive conduct like "banging one's hand on the podium, emphatic hand gestures, pointing, crying, clapping, or simply shifting one's tone." *Compare Merriott*, 179 F.4th at 406 *with* App. 003. For that same reason, the Decorum Policy's prohibition of "[d]isruptive

---

[26] *Threatening*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/threatening.

[27] *Disrupt*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/disrupt.

[28] *Disruptive*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/disruptive.

[29] *Unruly*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/unruly.

remarks or actions of approval or disapproval from the audience, such as feet stomping, snapping, whistling, yelling, clapping, verbal affirmation or rejection, or similar distractions," is clearly overbroad. App. 003.

Finally, the Decorum Policy grants to Defendant O'Hare "the right to interrupt and/or excuse a speaker . . . for any . . . matter at [his] discretion[.]" App. 003. This makes the Decorum Policy's overbreadth all the more blatant. And it gives Defendant O'Hare unbounded authority to silence or remove speakers in "limitless" ways. *See Merriott*, 179 F.4th at 406 (discussing potentially "limitless" policy applications). No limiting construction can save it.

**iii. *The Decorum Policy's overbreadth has already harmed plaintiffs and other constituents.***

While the Decorum Policy's overbreadth is readily apparent from its plain text, the evidence in this case provides helpful examples of how that overbreadth has played out in practice. For instance, Bishop Mark Kirkland was removed from a meeting after speaking "against how [the public was not] allowed to clap during Commissioners Court meetings." App. 009, ¶ 20. At one meeting, "all members of the public were forced to leave the room after Defendant O'Hare ordered everyone out following [the speaker's] statement, 'You keep telling us not to California my Texas, while in reality, you keep Russia my Texas.'" App. 010, ¶ 21. Defendant O'Hare has removed other speakers and attendees after calling him or proposed actions by the court racist. App. 010, ¶ 22.

Similarly, for Plaintiff Katherine Godby, the Policy's ban on "impertinent" remarks makes it "difficult for [her] to know in advance whether something [she] intend[s] to say will be permitted." App. 019, ¶¶ 21–22. She elaborated on this testimony by saying that "it often seems like if Judge O'Hare doesn't like your behavior, he can throw you out." App. 019, ¶ 23. Plaintiff Liz Miller also has "difficulty determining where permissible criticism ends and prohibited speech

begins." App. 026, ¶ 10. She has "seen Judge O'Hare tolerate certain conduct in some circumstances but respond differently to similar conduct if he perceives it as criticism or disagreement." App. 027, ¶ 12. Overall, "[i]t seems arbitrary when [Defendant O'Hare] removes people without saying what the person has done" and that this "leaves everyone in the room confused as to what the person did." App. 034, ¶ 16.

Moreover, Defendant O'Hare has punished or threatened to punish other expressive behaviors such as laughing, groaning, sighing, standing up, raising both hands to the sky, and using one's minute of public comment time to observe a moment of silence. App. 021, ¶ 35; App. 034, ¶ 15; App. 041, ¶ 13. So, too, could these provisions be used to punish rolling one's eyes, shaking one's head, raising a fist, raising a finger (thumb, middle, or index), or raising one's voice. Although Tarrant County can "restrict speech in a limited public forum like [Commissioners Court meetings], it must do so reasonably in light of the purpose of [the] forum." *Merriott*, 179 F.4th at 406. The Decorum Policy here is anything but reasonable. Its undefined terms and lack of limiting principles make it so that "nearly anything that could be uttered could fall within its reach." *See id.*; App. 003. This is especially offensive given the purpose of the forum: to host public debate and comment. *See Merriott*, 179 F.4th at 407.

**b. The Decorum Policy is unconstitutionally vague.**

"A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Merriott*, 179 F.4th at 407 (citation omitted). The Challenged Provisions flunk both these tests.

Where, as here, the "challenged enactment potentially restricts the right of freedom of speech, then the [vagueness] standard is more stringent." *Merriott*, 179 F.4th at 407 (citation

omitted). The same is true because application of the Challenged Provisions may lead to criminal penalties. *See Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (citation omitted); *see also Coates*, 402 U.S. at 615 ("The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people."). Taking these principles into account, the Fifth Circuit held in *Merriott* that prohibitions on "slanderous," "personal," and "impertinent" remarks, and on being "boisterous," were unconstitutionally vague, both because each failed to give notice of prohibited conduct and because they allowed for arbitrary enforcement. *Merriott,* 179 F.4th at 407–10. The same reasoning applies here.

**i. *The Challenged Provisions do not adequately articulate what conduct is prohibited.***

First, the Challenged Provisions are void for vagueness because they are "so unclear that people of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Merriott*, 179 F.4th at 407 (citation modified).

To start, *Merriott*'s holdings with respect to the vagueness of prohibitions on "slanderous" "impertinent" and "personal" remarks apply with equal force to the Challenged Provisions' ban of the same. *Id.* A "threadbare prohibition on 'slanderous' speech is void for vagueness," and a prohibition on "impertinent" remarks is as well, because their meaning turns "on a listener's sensitivity alone" while not "indicat[ing] whose sensibilities must be offended." *Id.* at 407–08 (citations omitted). And the Challenged Provision banning "personal attacks," App. 003, is vague for the same reason that "personal remarks" is vague: The "undefined" term "personal" also "turn[s] on a listener's sensitivity alone." *Id.*

Next, the Challenged Provisions' ban on "profane" and "obscene" remarks is similarly vague, given that they ban "similar language," the impact of which is dependent on the listener's

sensitivity. *See Merriott*, 179 F.4th at 408 (citation modified); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 244, 254 (2012) (finding that agency standards enforcing federal statute penalizing the utterance of "obscene, indecent, or profane language by means of radio communication" was vague as applied to "fleeting expletives and momentary nudity"). "The inherent vagueness in attempting to define what" some people will find profane or obscene, coupled with "the failure to specify whose sensitivities are relevant," renders these terms unconstitutionally vague. *See Kramer v. Price*, 712 F.2d 174, 178 (5th Cir. 1983), *vacated on other grounds on reh'g,* 723 F.2d 1164 (5th Cir. 1984). The same reasoning applies to the Challenged Provisions' ban on "threatening, disruptive, or unruly behavior": What qualifies is entirely dependent on the sensitivities of undefined listeners. App. 003.

Moreover, no guidelines exist to assist Commissioners Court attendees and speakers to avoid making remarks and gestures that violate any of the Challenged Provisions. *See Roy v. City of Monroe*, 950 F.3d 245, 252 (2020). They thus lack any context that might better inform speakers and attendees what speech and conduct is permitted. *See* App. 040–44; *Merriott*, 179 F.4th at 409.

The conclusion that the Challenged Provisions are vague is not undone by the fact that one may be able to define them using a dictionary. As *Merriott* explained, the vagueness of the terms here comes from the fact that their meaning turns on the sensitivities of undefined listeners in the context of a Commissioners Court meeting, not on any argument that they are difficult to define in the abstract. *See Merriott*, 179 F.4th at 408 ("[This Court] has never held that a dictionary definition is conclusive evidence of constitutionality."). Thus, although the Challenged Provisions may arguably use commonly understood terms, that does not change the fact that they are capable of multiple interpretations. *See Coates*, 402 U.S. 612–14; *Merriott*, 179 F.4th at 408–10.

The need for clarity here is only underscored by the Supreme Court's repeated instruction that a "more stringent vagueness test" must apply when a policy "interferes with the right of free speech." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted). That is because public debate should be "uninhibited, robust, and wide-open, and it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Instead, the Challenged Provisions "fail to provide speakers with a reasonable opportunity to know what conduct is prohibited" because the "terms [at issue] turn on a listener's sensitivity alone." *Merriott*, 179 F.4th at 408 (citation modified). This "lack of any guiding standards is particularly troubling because '[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked,' producing a chilling effect [on protected speech]." *Id*. at 410 (citation omitted). Here, that chilling effect is already present.[30]

**ii. *The Challenged Provisions allow for arbitrary and discriminatory enforcement.***

Second, the Challenged Provisions are also void for vagueness because they are "so indefinite that [they] allow[] arbitrary and discriminatory enforcement." *Merriott*, 179 F.4th at 407; *see also Kramer*, 712 F.2d at 176. *Merriott* again guides the way. There, the Fifth Circuit found the challenged policy's prohibitions on "personal, impertinent, or slanderous remarks," and on "becom[ing] boisterous" failed this test for largely the same reason they failed to provide notice: because "violations . . . turn[ed] only on the listener's discretion." *Merriott*, 179 F.4th at 409. The same applies to the Challenged Provisions. Indeed, the Decorum Policy empowers Defendant O'Hare with sole discretion to interpret the Challenged Provisions, thus favoring his subjective

[30] App. 021–22, ¶¶ 34–40; App. 011–12, ¶¶ 30–35; App. 037–38, ¶¶ 33–36.

perception above all others. *See* App. 002–04; *cf. Freedom from Relig. Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) ("Unbridled discretion runs afoul of the First Amendment because it risks self-censorship and creates proof problems in as-applied challenges."). Without any objective benchmark, the Decorum Policy gives speakers no way to know whether their remarks will cross the line. It gives Defendant O'Hare the kind of "unbounded discretion to apply the law selectively" that the Fifth Circuit has held unconstitutional time and again. *Kramer*, 712 F.2d at 178; *see also Merriott*, 179 F.4th at 408–10; *Reeves v. McConn*, 631 F.2d 377, 387–88 (5th Cir. 1980).

This unbounded discretion is even more troubling given that, unlike the policy at issue in *Merriott*, the Decorum Policy authorizes the County to seek criminal penalties for alleged violations. And the Policy explicitly empowers Defendant O'Hare to remove attendees and to "refer [them] for other civil sanctions and/or criminal charges" for "any other matter" that he decides. App. 004.

Like overbreadth, not only is the Decorum Policy's vagueness apparent from its plain text, but also the evidence in this case demonstrates that Defendant O'Hare has not been shy about wielding his unbounded authority. *See* App. 012, ¶ 32; App. 022, ¶ 36; App. 038, ¶ 35. Defendant O'Hare has also used his unfettered discretion to interpret and apply the Decorum Policy in ways that punish those who disagree with him. For example, Defendant O'Hare has refused to let attendees use a portion of their time "to hold a moment of silence in remembrance of jail deaths," an action not expressly prohibited by the Decorum Policy. App. 021, ¶ 35. Similarly, when a group of meeting attendees "stood silently in solidarity" with Commissioner Simmons' comments, Defendant O'Hare immediately told them to "[s]it down[.]" That is not expressly prohibited by the Decorum Policy either. App. 013, ¶¶ 40–41. Instances like this have led those like Plaintiff Karla Palomares to observe that "Judge O'Hare takes a lot of liberties with his power," that "[h]e

has a very 'I'll know it when I see it' attitude about violations of the Decorum Policy," and that "[i]t seems arbitrary when [Defendant O'Hare] removes people," "leav[ing] everyone in the room confused as to what the person did." App. 033–34, ¶¶ 12, 16.

Defendant O'Hare has also ejected the entire crowd from the meeting because some members of the public giggled or lightly applauded, although no provision of the Decorum Policy allows him to do so.[31] Defendant O'Hare has removed individuals who made no sound.[32] He has also threatened to remove the entire crowd for simply saying the word "yes," even when they were called upon to do so.[33] However, Defendant O'Hare does not show the same concern when speakers target other Commissioners or express beliefs that he agrees with. He has even allowed speakers to personally insult other Commissioners. For example, Defendant O'Hare allowed a speaker to yell "happy pride month, especially to Matt Krause . . . it's okay to come out of the closet. . . ."[34] In another instance, a speaker told Commissioner Ramirez that "Tarrant County deserves more than your weak leadership."[35] And on a number of occasions, speakers have directed negative comments towards Commissioner Simmons. App. 035–36, ¶ 23. None of these speakers faced consequences for their remarks. Similarly, speakers have called other Commissioners racist and faced no consequences, yet when someone calls Defendant O'Hare racist, they have usually been removed from the meeting. App. 035, ¶ 18; App. 012, ¶ 33.[36] And Defendant O'Hare has allowed members of the crowd to laugh without repercussion, but not at his expense.[37]

---

[31] *August Meeting* at 2:28:24.

[32] *June Meeting* at 4:03:59.

[33] *Id.* at 4:48:58.

[34] *Id.* at 4:21:02.

[35] *August Meeting* at 3:48:26.

[36] *See also June Meeting* (June 3, 2025) ("We won't be called racists").

[37] *Compare June Meeting* at 1:08:06, with *August Meeting* at 2:28:24.

Defendant O'Hare's completely "unfettered" power implicates the same concerns that were raised in *Kramer* and *Coates*. In his own words, Defendant O'Hare has declared that an attendee violates the Challenged Provisions if "I deem you are doing something out of order."[38] The meanings of the Challenged Provisions turn solely on Defendant O'Hare's personal sensitivity. *See Merriott*, 179 F.4th at 408. This creates exactly the kind of "unascertainable standard" that the Supreme Court warned against in *Coates*. *See* 402 U.S. at 614.

Because the Policy supplies no objective criteria for speakers and attendees to abide by, Defendant O'Hare has filled that void with his own subjective preferences. *See* App. 003–04. And he has used those preferences to silence critics while permitting speakers to hurl personal insults at other Commissioners. *See* App. 035–36, ¶ 23. His arbitrary and discriminatory enforcement of the indefinite terms contained in the Challenged Provisions (and the risk that he will do so in the future) thus serves as an independent basis for finding them void for vagueness. *See Merriott*, 179 F.4th at 407.

## II. Plaintiffs satisfy the remaining requirements for a preliminary injunction.

Plaintiffs have also demonstrated the remaining three requirements justifying a preliminary injunction: (1) that there is a substantial threat of irreparable injury absent the injunction, (2) that the threatened injury outweighs the harm the injunction may cause Defendants, (3) and that the injunction will not disserve the public interest. *See Opulent Life Church*, 697 F.3d at 288. *First*, Plaintiffs face a substantial threat of irreparable harm if preliminary relief is not granted because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Opulent Life Church*, 697 F.3d at 295. That injury is ongoing. Because they fear the consequences of violating

[38] *June Meeting* at 54:00.

the Decorum Policy's overbroad and vague provisions, Plaintiffs regularly self-censor their speech and expressive conduct at Commissioners Court meetings.[39] Consequences include reprimand, physical removal, cancellation of speaking time, temporary prohibition from commenting in person, banishment from meetings, or referral for criminal charges. App. 004. Absent preliminary relief, Plaintiffs will therefore continue to suffer the loss of First Amendment freedoms.

*Second*, the balance of equities favors Plaintiffs because the threatened injury to Plaintiffs outweighs any harm preliminary relief would cause Defendants, and an injunction will serve the public interest. Without an injunction, Plaintiffs will continue to self-censor their speech and expressive conduct.[40] By contrast, Defendants' "interest and harm merge with the public interest." *See Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). And "neither [Defendants] nor the public has any interest in enforcing a regulation that violates federal law;" indeed, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (citation omitted).

**III. Request for waiver of bond requirement.**

Plaintiffs request that the Court waive the requirement of bond as a condition for the issuance of preliminary injunctive relief. Fed. R. Civ. P. 65(c); *see Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding the requirement is discretionary). The likelihood that Defendants will incur significant monetary damage from an injunction is low, and Plaintiff is "engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981) (affirming waiver).

---

[39] *See* App. 021-22, ¶¶ 34, 39 (describing how Plaintiff Godby has self-censored because of the Policy); App. 011-13, ¶¶ 31, 36, 37; App. 028-29, ¶¶ 17, 22; App. 036–038, ¶¶ 25, 29–30, 35–36.

[40] Declarations, *supra* note 42.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a preliminary injunction and enter an order:

1. Enjoining Defendants, their affiliates, subsidiaries, officers, agents, servants and employees, and any persons in active concert with them, from directly or indirectly:
   a. Enforcing the following provisions of the Tarrant County Commissioners Court Decorum Policy:
      i. The prohibition on "[p]ersonal attacks, impertinent, profane, obscene, or slanderous remarks";
      ii. The prohibition on "[t]hreatening, disruptive, or unruly behavior";
      iii. The prohibition on "[d]isruptive remarks or actions of approval or disapproval from the audience, such as feet stomping, snapping, whistling, yelling, clapping, verbal affirmation or rejection, or similar distractions";
      iv. The provision stating that "[t]he County Judge maintains the right to interrupt and/or excuse a speaker when the allocated time has expired, if the speaker otherwise violates these guidelines, or for any other matter at the discretion of the County Judge."
2. Excusing Plaintiffs from posting surety bond or a certified or attorney's check as security for the payment of damages tow which Defendants may be entitled for wrongful injunction or restraint. *See* Fed. R. Civ. P. 65(c).
3. Granting such other and further relief as the Court deems just and proper.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Peter B. Steffensen*
Peter B. Steffensen
Texas Bar No. 24106464
**SMU DEDMAN SCHOOL OF LAW FIRST AMENDMENT CLINIC**
P.O. Box 750116
Dallas, Texas 75275
(214) 768-4077 (Telephone)
(214) 768-1611 (Fax)
psteffensen@smu.edu

Thomas S. Leatherbury
Texas Bar No. 12095275
**THOMAS S. LEATHERBURY LAW, PLLC**
Cumberland Hill School Building
1901 N. Akard St.
Dallas, Texas 75201
(214) 213-5004 (Telephone)
tom@tsleatherburylaw.com

Nina Lea Oishi
Texas Bar No. 24142250
**TEXAS CIVIL RIGHTS PROJECT**
P.O Box 1108
Houston, Texas 77251
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
noishi@texascivilrightsproject.org

Sarah Xiyi Chen*
Texas Bar No. 24144784
Zachary Dolling
Texas Bar No. 24105809
Danyelle Honoré
Texas Bar No. 24148514
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 17757
Austin, Texas 78760
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
schen@texascivilrightsproject.org
zachary@texascivilrightsproject.org
danyelle@texascivilrightsproject.org

*Pro hac vice application pending

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I certify that on September 28, 2026, I filed a true and correct copy of the above and foregoing instrument with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on counsel for Defendants in a manner authorized by Federal Rules of Civil Procedure 5(b).

*/s/ Peter B. Steffensen*
Peter B. Steffensen